UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES MILSTEAD, #300739

        Petitioner,        CASE NUMBER: 07-15332
                              HONORABLE VICTORIA A. ROBERTS
                              Magistrate Judge Virginia M. Morgan

v.

JERI-ANN SHERRY, WARDEN

        Respondent.
_____/

## ORDER DENYING MOTION FOR RELIEF FROM JUDGMENT

**I.    INTRODUCTION**

Before the Court is Petitioner Charles Milstead's motion for relief from the Court's March 25, 2011 order denying his petition for writ of habeas corpus. Petitioner's motion is **DENIED**. But in light of an issue he raises, the Court takes this opportunity to clarify the standard of review applied to Petitioner's request for habeas relief.

**II.    BACKGROUND**

On March 25, 2011, the Court denied Petitioner's application for writ of habeas corpus. The Court held that Petitioner's trial and appellate attorneys did not render constitutionally ineffective assistance, and his challenges to the legality of his indictment and to the admissibility of certain hearsay statements under Michigan's co-conspirator exception to the hearsay rule, MICH R. EVID. 801(d)(2)(E), were procedurally defaulted. (Doc. # 20). Petitioner asks the Court to reconsider its ruling under FED. R. CIV. P. 59.

### III. LEGAL STANDARD

A motion to alter or amend judgment under Rule 59(e) may be granted only if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice. *GenCorp, Inc. v. Am. Inter. Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). "To constitute 'newly discovered evidence,' the evidence must have been previously unavailable." *Id.*

### IV. ANALYSIS

**A. There is substantial evidence Petitioner and Sexton conspired to kill Brian Gross *in addition to* the evidence that Petitioner came to Sexton's and Slavik's preliminary hearing to kill Gross. Further, the Court did not clearly err when it held that this substantial other evidence eliminated any potential prejudice resulting from Petitioner's attorneys' allegedly deficient performances.**

Petitioner is not entitled to relief from the Court's ruling under Rule 59(e).

Petitioner says the Court ruled that he was at Sexton's and Slavik's preliminary hearing to murder Brian Gross (a witness planning to testify against them in their upcoming robbery trial), which demonstrates that he conspired with Sexton to murder Gross. He says the record does not support this "outcome-determinative" factual finding because the only proof he was at the hearing to murder Gross was Sexton's hearsay statements to Slavik, which were inadmissible because they were not supported by independent evidence of a pre-existing conspiracy. He attaches exhibits to his motion to corroborate his claim that he was at the court that day to pay a traffic ticket.

The Court's order denying habeas relief did not rely on Sexton's statements to Slavik about Petitioner's motives for coming to the preliminary hearing. The Court

2

highlighted additional record evidence of a conspiracy between Sexton and Petitioner. The Court observed that the Michigan Court of Appeals found that the "evidence clearly showed that Sexton and defendant discussed and planned the crime." *People v. Milstead*, 250 Mich.App. 391, 404, 648 N.W.2d 648 (Mich. Ct. App. 2002). This finding is supported by the record and is presumed correct under 28 U.S.C. § 2254(e).

The record reveals, Slavik did not know Petitioner when Sexton suggested Petitioner would murder Gross. (6/29/99 Tr. 16). Slavik testified at trial that Sexton and Petitioner called him numerous times and left messages on his answering machine. (*Id.* at 27). Eventually, Sexton reached Slavik; Sexton told Slavik that Petitioner would call him to "set up this arrangement," *i.e.*, the murder of Gross and payment for the murder, providing a date and time to expect the call. (*Id.* at 28-29). As promised, Petitioner called Slavik, but refused to speak on the phone. (*Id.*). Petitioner told Slavik that he would contact Sexton and future arrangements would be made. (*Id.*) Slavik testified that Sexton called him again and gave him another time to expect a call from Petitioner. (*Id.* at 30). Petitioner called Slavik again and told him he wanted to meet at Elizabeth Park the next day. (*Id.*)

The following day Petitioner and Slavik met at Elizabeth Park. Slavik testified he asked Petitioner: "So tell me what's going to happen [?]" without mentioning a plot to murder Gross. (*Id.* at 32). However, Petitioner knew what Slavik was referring to; Slavik's trial testimony was this:

> Q. What did [Petitioner] Charlie say?
> A. Right. He would say that: I'm going to need a couple of weeks to learn more about Brian [Gross] as far as his habits, going to and from work. I basically want to stake the place out and see how it goes.
> A couple options were discussed as far as doing something to his

> car or a possible robbery that would go wrong, things along that line.
> Q: Did you join in the planning, or is he just telling you his –
> A: I was asking him how it would go. I wanted to know. I –
> Q: He was talking about a possible robbery or –
> A: Right.
> Q: That was not suggested by you?
> A: No.
> Q: That was from Charlie?
> A: Right.
> Q: Okay. What else happened?
> A: I asked him questions like: How do I know you're capable of doing such a thing, you know?
> Q: What did he say?
> A: Things like this have been done before. I asked him if he had personally done, and he said that he was just the moneyman. He wasn't the actual – the gunman in incidents like this.
> Q: Okay.
> A. Basic –
> Q: So then what happened?
> A: I was basically asking, you know: So tell me what's going to happen. In closing, towards the end of the conversation, I just said: Give me a dry run. Tell me, again, what's going to happen.
> Q: And what did he say?
> A: He said that he or – he, either alone or with somebody or something like that, would go up, possibly shooting Brian. It's hard – we had such a long conversation, I don't want to – I don't want to say the wrong thing. It's – I'm not sure of the order of the conversation, how it went with – just basically he told me he would do that at the place of work, unless the place of work was no good. He said, in two weeks, he wanted me to leave town because – two weeks from that day I was to go to New York – I have family in New York – and be there for a week or two, or however long it took for him to do what he was doing. This way I was – I had an alibi, and that during that time this would happen – this would take place.

(*Id.* at 33-35). Slavik also testified that Sexton told him how much money to pay Petitioner and that Petitioner wanted it "half down, and half upon completion." (*Id.* at 36). Slavik gave Petitioner the money and Petitioner went into Slavik's car to count it. (*Id.*).

This testimony establishes the existence of a plot between Sexton and Petitioner to murder Gross before Petitioner ever discussed the scheme with Slavik. The murder

4

was originally Sexton's idea.  Sexton acted as a middleman between Petitioner and Slavik, who did not know each other before Sexton introduced them.  Petitioner knew the purpose of his meeting in the park with Slavik before he arrived, without any prior discussion between them.  Had Petitioner and Sexton not agreed to murder Gross before Petitioner first spoke with Slavik, there would have been no reason for Petitioner to get in touch with Slavik, to tell Slavik he was uncomfortable speaking on the phone, or to meet Slavik in the park. Petitioner's conversation in the park and phone calls to Slavik establish that Sexton solicited Petitioner to murder Gross and that Petitioner thought about and planned the murder before meeting with Slavik.  Slavik indicated he did not have to say much before Petitioner began discussing the details of his plot.  Therefore, the agreement to murder Gross was between Petitioner and Sexton; it was entirely independent of Slavik and law enforcement officials.

Slavik's testimony  provided independent evidence of the existence of a conspiracy between Petitioner and Sexton for purposes of the co-conspirator exception to the hearsay rule.  Thus, it was not unreasonable for trial counsel not to object to the indictment or to the admission of Sexton's statements about the preliminary hearing.  Likewise, it was not unreasonable for appellate counsel not to argue that trial counsel was ineffective for failing to lodge meritless objections.

In its March 25 order, after discussing the proof of a conspiracy between Petitioner and Sexton, and upon *de novo* review of the state trial court's decision on the merits of the ineffectiveness claims, this Court found that Petitioner was not denied effective assistance of trial or appellate counsel.  This holding was not clear error.

The Supreme Court recently observed:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of material outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." ...The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington v. Richter*, 131 S.Ct. 770, 788 (2011) (citations omitted).  The Court emphasized that establishing entitlement to relief based on ineffective assistance of counsel under AEDPA is even more difficult than doing so on *de novo* review:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential,"...and when the two apply in tandem, review is "doubly" so.... The *Strickland* standard is a general one, so the range of reasonable applications is substantial....Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were unreasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

The Court found that there was substantial evidence of a conspiracy between Sexton and Petitioner to murder Gross.  This evidence is independent of Sexton's statements to Slavik that Petitioner came to their preliminary examination to murder Gross and is "independent, competent evidence...[of] the existence of a conspiracy." (Doc. # 24; Br. in Support of Petitioner's Rule 59 Motion for Relief from Judgment at 3). Therefore, the Court declines Petitioner's invitation to hold an evidentiary hearing to flesh out the events surrounding his appearance at the preliminary hearing.  There is no reasonable probability that the jury would have acquitted Petitioner if it had heard more evidence that he was at the 33rd District Court to pay a fine.

> **B.  The Court reviewed the merits of Petitioner's ineffective assistance claims and concluded, upon *de novo* review of the state trial court decision, that trial and appellate counsel were not constitutionally ineffective**.

Petitioner says his ineffective assistance of counsel claims are not procedurally barred because the Michigan Court of Appeals denied application for leave to appeal for lack of merit. The Court agrees; the Michigan Supreme Court's unexplained order denying relief under MCR 6.508(D) did not require the Court to conclude that Petitioner's Sixth Amendment claims were procedurally defaulted. *See Guilmette v. Howes*, 624 F.3d 286, 289-92 (6th Cir. 2010) (holding that brief orders citing MCR 6.508(D) can refer to the petitioner's failure to establish entitlement to relief on the merits or procedurally, and that the court must look to the "last reasoned state court decision" to determine whether a procedural bar was enforced).

The Court's March 25 order addressed the merits of Petitioner's ineffectiveness claims, holding only that any underlying claim to relief which charges a denial of due process because the conspiracy charge in the indictment itself was unconstitutional, was procedurally defaulted. Upon review, it appears Petitioner raised the narrow issue of whether the trial court's order stating his attorneys were constitutionally ineffective compelled a finding, at the state court level, of cause and prejudice to excuse his failure to raise the underlying claims before trial, or on direct appeal, in other words, that Petitioner was entitled to a new trial. *Cf. Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (ineffective assistance adequate to establish cause for procedural default of some other constitutional claim, is

7

itself an independent constitutional claim)).

In any event, the Court did not hold that Petitioner's ineffectiveness claims were procedurally barred. In fact, the procedural default rule does not apply to ineffective assistance of appellate counsel claims; it only applies to claims that could have been brought on direct appeal. *Guilmette*, 624 F.3d at 292. The Court reached the merits of the claims, finding that Petitioner's trial and appellate attorneys were not constitutionally ineffective under *Strickland v. Washington*, 446 U.S. 668 (1984) because Petitioner was not prejudiced by their performances. After this finding, the Court held Petitioner could not establish "actual prejudice" resulting from the alleged violation of federal law to excuse his procedural default of any underlying due process claim. *See Hall v. Vasbinder*, 563 F.3d 222, 237 (6th Cir. 2009) (observing that the prejudice analysis for a procedural default and the prejudice analysis for ineffective assistance of counsel are sufficiently similar to treat as the same).

Petitioner's claim that this Court should grant relief because the trial court said his attorneys were constitutionally ineffective is related to this Court's analysis of the proper standard of review. For the reasons discussed below, the Court rejects this argument.

The state trial court's order denying relief from judgment is misleading; it states that trial and appellate counsel were constitutionally ineffective, and then inconsistently says Petitioner did not suffer actual prejudice by their performances, and was not entitled to relief. *See, e.g., id.* ("To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient *and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.*")

(emphasis added). Moreover, the Michigan Court of Appeals denied application for leave to appeal, in a brief, unpublished opinion, for "lack of merit on the grounds presented." The Michigan Supreme Court's form order denied leave to appeal simply because Petitioner failed to meet his burden to establish entitlement to relief under MCR 6.508(D). The state trial court's confused order, and the unexplained orders of the state appellate courts, complicate this Court's analysis of the appropriate standard of review. Thus, while the Court declines to reconsider its dismissal of Petitioner's application, a more thorough discussion of the standard of review is in order.

If a state court adjudicates a petitioner's federal claim on the merits, the district court applies the highly deferential AEDPA standard of review to determine whether the state court decision is contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). But when a state court declines to address the merits of a properly raised issue, this Court conducts *de novo* review of the state court decision. *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).

*De novo* review is favorable to Petitioner, who was ultimately denied relief by the Michigan state courts on his Sixth Amendment claim, because it does not compel the same deference to the state courts' decisions as § 2254(d). *Id.* at 436 (citing *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001)); *see also Harrington*, 131 S.Ct. at 785 (explaining that under AEDPA the district court does not determine whether the state court *incorrectly* applied federal law, as it does when the case involves *de novo* review under the federal law itself, but only whether the state court *unreasonably* applied federal law); *Fischetti v. Johnson*, 384 F.3d 140, 150 (3d Cir. 2004) (under AEDPA the

9

district court does not determine whether the state court committed simple error, but whether it was error that contradicted or unreasonably applied Supreme Court precedent). "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 131 S.Ct. at 786. "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunction in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring in judgment)).

In its March 25 order, the Court applied *de novo* review and held that Petitioner was not prejudiced by trial counsel's failure to challenge the legality of the charge and the admissibility of co-conspirator statements, or by appellate counsel's failure to argue ineffective assistance of trial counsel. Although the state trial court's statement that trial and appellate counsel were "constitutionally ineffective" suggests a decision on the merits, which normally triggers AEDPA review, this Court conducted *de novo* review because the trial court inconsistently denied relief, holding Petitioner did not suffer "actual prejudice" under MCR 6.508(D)(3)(b). The trial court's holding should have compelled the conclusion that Petitioner's attorneys were not constitutionally ineffective. *See Strickland*, 466 U.S. at 692 ("[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance of counsel under the Sixth Amendment.").

Because it appeared the trial court did not assess the prejudice prong of *Strickland*, but only addressed "actual prejudice" under MCR 6.508(D)(3)(b) for purposes of procedural default of the underlying claims, this Court did not (and could

not) defer, under AEDPA § 2254(d), to a state court *Strickland* prejudice analysis. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (when the state court fails to address prejudice, under *Strickland*, the district court's review is not circumscribed by the state court conclusion with respect to prejudice); *Joseph v. Coyle*, 469 F.3d 441, 460 n. 14 (6th Cir. 2006) (observing that the AEDPA standard does not apply to an analysis of *Strickland*'s prejudice prong where the state court fails to address that prong in its opinion); *Maples*, 340 F.3d at 437 (under Supreme Court precedent, courts must review ineffective assistance of counsel claims *de novo* where the state court fails to address *Strickland* prejudice).

For the same reason, this Court was not required to grant habeas relief simply because the state trial court said trial and appellate counsel were constitutionally ineffective, as Petitioner urges. The trial court did not analyze *Strickland* prejudice. Had it done so, it would have concluded Petitioner's attorneys were not constitutionally ineffective. At the state court hearing on the motion for relief from judgment, the court said, based on some of the evidence, a rational factfinder could conclude that Petitioner was a member of a conspiracy to murder; however, it could not go so far as to say that but for counsels' alleged errors, Petitioner would have had a reasonably likely chance of acquittal. (*See* 9/26/05 Tr. 12-14). In other words, Petitioner's attorneys were not constitutionally ineffective because their deficient performance, in all likelihood, did not impact the outcome of the proceedings. A finding of ineffective performance at prong one, does not mandate a finding of prejudice at prong two, or of actual prejudice under MCR 6.508(D)(3)(b). Nor can this Court grant federal habeas relief simply because the trial court's analysis may have been flawed in reaching the right result.

Instead, this Court concluded the trial court held that Petitioner's trial and appellate attorneys were *deficient*, rather than constitutionally *ineffective*, and that it left the question of *Strickland* prejudice unanswered. This reading of the state court's decision is supported by Sixth Circuit case law emphasizing that the showing of prejudice required to establish ineffective assistance of counsel overlaps with that required to excuse a procedural default. *See Johnson v. Sherry*, 586 F.3d 439, 447 (6th Cir. 2009); *cf. Fischetti*, 384 F.3d at 155 (equating "actual prejudice" to excuse a procedural default in the context of a substantive ineffective assistance of counsel claim with prejudice under *Strickland*). Therefore, this Court was not required to defer to the trial court's constitutional ineffectiveness finding under § 2254(d).

Finally, the Court notes that the Michigan Court of Appeals, in an unexplained order, denied Petitioner's application for leave to appeal the state court order denying relief from judgment for "lack of merit on the ground[ ] presented," *i.e.*, that a state court finding of ineffectiveness of trial and appellate counsel is *per se* prejudicial. In a recent opinion, the Supreme Court explained, "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2). There is no text in the statute requiring a statement of reasons. The statute refers only to a 'decision,' which resulted from an 'adjudication.'" *Harrington*, 131 S.Ct. at 784. Thus, the AEDPA standard of review applies to a state court decision on the merits, even when that decision is unexplained. *See id.* at 785 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

It may have been appropriate for this Court to apply the AEDPA standard of review to the Michigan Court of Appeals decision to deny relief on the merits on the ground presented, which was the same ground presented here. However, resolution of whether the Court should have applied AEDPA review, rather than *de novo*, to the state court decisions, is unnecessary; under either standard, Petitioner is not entitled to relief from the state court decisions.

## V. CONCLUSION

Petitioner's Motion for Relief from Judgment is **DENIED.**

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: May 17, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on May 17, 2011.

s/Linda Vertriest
Deputy Clerk